**Opinion issued December 14, 2017**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00774-CV

———————————

## IN RE PATTI J. WAGNER, AS GUARDIAN OF JENNY WAGNER, AN INCAPACITATED ADULT, Relator

**Original Proceeding on Petition for Writ of Mandamus**

## OPINION ON REHEARING

Real parties in interest, Four J's Community Living Center, Inc. ("Four J's) and Anthonia Uduma ("Uduma"), have filed motions for rehearing and for en banc reconsideration of our April 27, 2017 opinion. We deny the motion for rehearing, but withdraw our opinion and issue the following opinion in its stead. Because we issue a new opinion in connection with the denial of rehearing, the motion for en banc reconsideration is rendered moot. *See Richardson–Eagle, Inc. v. William M.*

*Mercer, Inc.*, 213 S.W.3d 469, 472 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 33 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).

Relator, Patti J. Wagner ("Wagner"), as guardian of Jenny Wagner ("Jenny"), an incapacitated adult, has filed a petition for a writ of mandamus, requesting that this Court direct respondent[1] to vacate his order granting the new-trial motion of real parties in interest, Four J's Community Living Center, Inc. ("Four J's) and Anthonia Uduma, in Wagner's suit against them for negligence. In her sole issue, Wagner contends that respondent clearly abused his discretion in granting a new trial and she has no adequate remedy by appeal.

We conditionally grant Wagner's petition.

## Background

In her second amended petition, Wagner alleged that on September 4, 2008, Jenny was severely burned in a fire at a four-bedroom residential care facility ("the facility"),[2] operated by Four J's and Uduma,[3] for disabled adults. At the time of the

---

[1]     Respondent is The Honorable Dan Hinde of the 269th District Court of Harris County. The underlying suit is *Patti J. Wagner, as Guardian of Jenny Ann Wagner, as Incapacitated Adult v. Four J's Community Living Center, Inc. and Anthonia Uduma*, No. 2009-40925 (269th Dist. Court, Harris County, Tex.).

[2]     The record reveals that the facility is a single-story, single-family home.

[3]     Uduma is the president, chief executive officer, and sole shareholder of Four J's. She is also the sole owner of the facility, which she leased to Four J's.

2

fire, Jenny, a resident of the facility, was thirty-five years old. She has been legally blind since infancy, and she has cerebral palsy and "profound mental retardation." Jenny shared the facility with two other adult residents, Esperanza Arzola and Tanya James, who both "had the mental capacity of small children."

Wagner further alleged that Four J's and Uduma had inadequately supervised Arzola, who had obtained a cigarette lighter and used it to start the fire in her bedroom. When the fire spread to the rest of the facility, Jenny, who was wheelchair-bound and physically incapable of escaping the fire on her own, sustained smoke-inhalation injuries and second- and third-degree burns to her face, neck, chest, arms, and hands. She was hospitalized in a burn-trauma center for one month and endured painful treatments. The burns have permanently scarred and disfigured Jenny. James, who was also severely burned in the fire, later died from her injuries.

Wagner asserted that Four J's and Uduma breached the standards of care of a residential care facility by inadequately supervising Arzola; failing to equip the facility with properly functioning fire-detection and prevention systems, such as smoke detectors and overhead sprinkler systems; and failing to adequately train staff to respond to a fire at the facility. Also, because it was reasonably foreseeable that if a resident came into possession of a cigarette lighter, a fire would likely result, they breached their duty to ensure that Jenny was safe from foreseeable harm caused by other residents who were unable to understand the dangers of incendiary devices.

3

Moreover, the sole staff member on duty at the time of the fire, Amuche Chinelo Udemezue, had run from the facility without attempting to assist Jenny.

Wagner further asserted that Four J's and Uduma's breaches of the standards of care proximately caused Jenny to inhale smoke and sustain second- and third-degree burns, hospitalization for one month, painful debridement of wounds, tube feeding due to inhalation injuries, and permanent scarring and disfigurement. And, Uduma was jointly and severally liable for the wrongful and negligent conduct of Four J's because it is her alter ego.[4]

Four J's and Uduma, in their answer, generally denied Wagner's allegations, and they asserted various affirmative defenses, including that their actions and omissions did not constitute "a proximate or producing cause" of Jenny's injuries. Rather, Jenny's injuries were caused by "the intervening actions of an independent, responsible third party," namely Arzola, "who started the fire in question."[5]

At trial, Udemezue testified that she began working for Four J's in 2007. Her training included watching a "CD" and working with another staff member for two days before being left to work alone at the facility. Four J's did not give her keys to any of the doors at the facility. Rather, a Four J's van driver would routinely drive

---

[4] Wylette Taylor, on behalf of James's son, intervened to also assert claims against Four J's and Uduma.

[5] Respondent granted Four J's and Uduma's motion to designate Arzola as a responsible third party. *See* TEX. CIV. PRAC. & REM. CODE ANN. Ch. 33 (Vernon 2015).

4

her to the facility, and he would unlock the front door to let her inside. The back door was the only other outside door at the facility; however, it had a deadbolt lock that required a key to open it from the inside, and she did not have a key. Udemezue noted that the garage door of the facility did not properly function, and it would fall down if used. Thus, each week, the facility trash was gathered from the garage and removed through the living room and front door.

Udemezue explained that, initially, the facility had three residents: Jenny, James, and Arzola. Later, a fourth resident, Elisha Campbell, moved in. Udemezue routinely supervised the four residents on her own. She had to "do virtually everything" for Jenny, who needed "total care." They had a good relationship, and Jenny used to sing for Udemezue. James also needed "total care," including assistance with bathing and brushing her teeth. Although James was able to feed herself, she had to be prompted to complete basic tasks. She was also "fond of hitting herself," and she would "hurt herself most of the time" if her hands were not kept separated. Udemezue noted that Arzola was "something else." She was aggressive and "acted up all the time." Arzola often damaged property and ran away from the facility. And Udemezue was "very scared" of Arzola. Campbell was also aggressive and difficult for Udemezue to manage.

On the day of the fire, while Udemezue was working in Jenny's room, Arzola came in and tried to assist with Jenny. Udemezue, concerned about Arzola's

5

handling Jenny, directed her to return to her bedroom. Arzola became angry, but complied. Udemezue then heard a "big bang," went to Arzola's bedroom, and saw that Arzola had broken a window. Udemezue telephoned a case manager to report Arzola's conduct, but she was unable to reach him. She also telephoned a nurse, who told her how to treat the cuts that Arzola had sustained in breaking the window. Arzola then calmed down and apologized to Udemezue. While they were talking, Udemezue heard sirens and looked outside. She told Arzola that it appeared that a house at the end of the road was on fire.

Later, while Udemezue was washing clothes, she heard another "big bang." Thinking that something had occurred outside, she rushed to investigate. Once outside, however, she saw through a window into Arzola's bedroom, which was situated next to the front door, that her room was on fire. Udemezue rushed back inside, pulled Campbell from her bedroom, and led her outside. Udemezue then went back inside the facility toward Jenny's and James's rooms. However, she panicked when she realized that the fire was very close to the front door and she did not have a key to the back door. She also knew that the garage door did not function. Thus, with access to only one door to the outside, Udemezue knew that "[i]f the fire g[ot] to that front door, that's it." They were "finished." She yelled to Arzola, and together they ran from the house. After Udemezue telephoned for emergency

6

assistance and shouted for help from neighbors, she "passed out." She later awoke inside an ambulance.

Udemezue further testified that she had panicked during the fire because she had only "one exit." And she "would have tried [her] best if [she had] had another door in that house." She also noted that she was alone and there would have been a better outcome had she had the assistance of at least one other staff member. Although Four J's did provide Udemezue with fire-emergency training on two occasions, she, in both drills, was trained to exit through the front door. And neither drill involved the use of a fire extinguisher or placing Jenny in a blanket to evacuate her from the facility.

Chiaka Irondi testified that from 2006 to February 2008, she worked for Four J's at the facility. She noted that the back door of the facility could not be operated without a key. Although the back-door key, at some point before Irondi left, had been lost, she had reported it to Four J's. And the garage door, which was inoperative, had to be physically held up in order for one to pass underneath it. Moreover, although Four J's did not provide Irondi with any fire-emergency training, Four J's did require her to sign a statement that she had received such training.

Kevin Kern, the Director of Residential Services for The Center in Houston, testified as an expert about the standards of care applicable to facilities that provide

residential services to persons with intellectual and developmental disabilities. Prior to his testimony, Kern reviewed the Four J's evacuation plans, Udemezue's deposition, the Houston Fire Department ("HFD") arson report, and documents concerning the other residents at the facility. Based on his review, he opined that the applicable standards of care required that a residential care provider prohibit a resident with Arzola's history of physical and verbal aggression and self-injurious behavior any access to an incendiary device, such as a cigarette lighter. Further, such a facility must provide adequate supervision and room inspections by staff. Kern explained that persons like Arzola are unable to "realize the consequences of their actions at the time that they are upset."

Based on the individual needs of the residents at the facility, the applicable standards of care required that "the house most definitely needed to be double staffed." Specifically, Kern noted that one of Four J's residents required total care and several of them had behavioral issues or concerns. He explained that it "would be impossible to be bathing a client in the bathroom when you may have another client that's trying to leave the home or have a physical altercation with another resident."

Kern further explained that the applicable standards of care for a four-bedroom residential care facility, such as here, required that it have a fire-sprinkler system, unless each of the residents was able to evacuate within three

minutes, which is a "prompt evacuation score." Because this training must "be consistent across various shifts and different times of the day and night," such a facility must perform "third shift [fire] drill[s]." The standards of care also dictated that facility staff be trained in the use of a fire extinguisher. Kern, based on the reviewed HFD photographs, noted that Udemezue, while inside the facility during the early stages of the fire, did not use the facility's fire extinguisher. He also noted that the only way that the keyed deadbolt lock on the back door could have met the applicable standards of care was if all of the residents had had access to a key and were mentally and physically capable of opening the door with the key. Based on her condition, Jenny could have "never met that criteria." Moreover, it was apparent that a key to the deadbolt was not available, even for the staff. Kern further testified that Four J's, in his opinion, had breached the standards of care in each of the areas that he had outlined.

Rick Overholt, general manager of Omni Fire and Security Systems, LP, testified that he had installed a fire alarm at the facility. He installed a local alarm, however, that was not designed to automatically notify HFD in the event of a fire.

Dr. K. Gollaher testified that in March 2009, she performed a court-ordered evaluation of Arzola's competency to stand trial for the offense of arson[6] in a separate criminal proceeding. She deemed Arzola incompetent to stand trial.

---

[6]     *See* TEX. PENAL CODE ANN. § 28.02 (Vernon 2011).

9

Gollaher explained that Arzola had experienced auditory hallucinations, had tremendous difficulty answering questions and understanding terms, and did not understand that a death had resulted from the fire.

Uduma testified that she is the president, chief executive officer, and sole shareholder of Four J's. She is also the sole owner of the facility, which she leases to Four J's. Although Four J's staff were "never supposed to leave" residents unattended, there were, at the time of the fire, four clients residing at the facility and only one staff member on duty. Uduma admitted that the back door of the house had a deadbolt lock that required a key to open it from the inside, and staff members usually did not have keys to the back door.

Uduma and Four J's, prior to the fire, were aware that Arzola had been diagnosed with bipolar disorder, had tried to commit suicide, and had a history of violence toward the staff. Uduma was also familiar with Arzola's psychological evaluation and "Annual Individual Service Plan," which Four J's had completed the month before the fire. Arzola, who was then twenty-five years old, had, as a child, been emotionally, physically, and sexually abused, which included her being compelled into prostitution, by her biological parents. After their parental rights had been terminated, Arzola's parents facilitated her unauthorized departure from Richmond State School and took her to the Dallas area, where she "became infected with herpes as a result of . . . sexual activity between her and her father." She also

10

had a history of alcohol and narcotics abuse; numerous placements in residential treatment centers; and "multiple contacts" with the Dallas Juvenile Justice Department for running away, evading arrest, prostitution, probation violations, and assault. Further, Arzola had a long history of behavioral issues, including breaking windows and light fixtures; attempting to leap from moving vehicles; swallowing objects; wrapping ligatures around her throat; biting herself and others; and "headbanging," choking, stabbing, and bludgeoning others.

Based on a "complete diagnostic evaluation," Four J's concluded that Arzola was functioning "within the mild range of mental retardation" and her behavior was "non-compliant most of the time." Although she had not been adjudicated incompetent by a court and was acting as her own legal guardian, her behavioral problems were "severe" and required multiple psychotropic medications to manage. And they were "typically occasioned by staff making requests of her, delaying or denying her tangibles or services," or "dividing their time" between Arzola and others. Because Arzola's aggression might result in injury to herself and others, Four J's directed that staff "[k]eep all sharps, medications, and poisons" in locked storage.

Uduma further testified that although Four J's allowed Arzola to smoke cigarettes, it did not allow her to keep a cigarette lighter. Uduma did not know how Arzola had obtained the cigarette lighter that she had used to start the fire. However,

11

she conceded that Four J's did not ever search Arzola's room for contraband because the room "belong[ed] to her." She opined that Arzola was solely responsible for the injuries that had resulted from the fire because Arzola was "a competent adult who was only mild[ly] mental[ly] retarded," she had set the fire, and law-enforcement authorities had arrested her for arson. Uduma asserted that had Udemezue followed her training, she would have been able to timely evacuate all of the residents without injury. And she noted that a key to the back door was located in a drawer at the facility.

Ngozi Obichuku, a care coordinator at Four J's, testified that that Jenny was the only client at the facility who needed physical assistance to evacuate. And, on May 13 and June 6, 2008, Obichuku had trained Udemezue about Jenny's individual evacuation plan. She asserted that Udemezue simply did not follow her training during the fire. Obichuku further explained that the residents of the facility were allowed to take "smoking breaks," during which the staff "issue[d] out the lighters." And the staff were responsible for collecting the lighters "after the clients [we]re done."

In Question One of his charge, respondent asked the jury: "Did the negligence, if any, of those named below [Four J's, Uduma, and Arzola] proximately cause the injuries in question?" In regard to both Four J's and Uduma, the jury answered, "Yes." In regard to Arzola, the jury answered, "No." In answer to Question Two of

12

the charge, the jury apportioned the responsibility of Four J's at 60 percent and Uduma at 40 percent. And it awarded Wagner damages in the amount of $8,071,600.00.

After respondent entered a judgment on the verdict, Four J's and Uduma filed a motion for new trial. They argued, in part, that there is "no evidence, legally insufficient evidence, or factually insufficient evidence" to support the jury's findings in Questions One and Two of the charge because "the evidence established that the fire that caused the injuries to [Wagner] and the death of [James] was caused by the intentional arson of [Arzola]." And, because "the evidence shows that the risk of Arzola's arson was unforeseeable to Four J's and [Uduma], . . . neither Four J's nor [Uduma] had a duty, as a matter of law, to protect [Wagner] and [James] from the criminal act of Arzola." Four J's and Uduma argued that the jury's "finding of no negligence against Arzola was against the great weight and preponderance of the evidence" because the "undisputed evidence revealed that the fire that caused the injuries to [Wagner] and the death of [James] was solely caused by [Arzola], who intentionally used a lighter to start the fire."

> Respondent granted Four J's and Uduma's new-trial motion, explaining:
>
> The reason for the Court's grant of new trial is that the jury's failure to find negligence on [Arzola], who started the fire that was the cause-in-fact of the injuries to [Wagner] and the death of [James], is so against the great weight of the evidence as to be clearly wrong and manifestly unjust. *See Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646. 651 (Tex. 1988).

13

Wagner moved for reconsideration, asserting that even if the evidence establishes causation-in-fact regarding Arzola, the jury could have reasonably concluded that Arzola did not proximately cause Jenny's injuries. Respondent denied Wagner's motion for reconsideration.

Uduma subsequently filed a motion to dismiss Wagner's claims against her on the ground that she is a health-care provider and Wagner had failed to timely serve her with an expert report.[7] This Court affirmed respondent's order denying Uduma's motion to dismiss.[8] Wagner then filed her petition for a writ of mandamus.

## Waiver

As a preliminary matter, Four J's and Uduma argue that Wagner has "waived the right to seek review via mandamus" because she "can offer no justifiable excuse for a three-year delay in seeking relief."

Although mandamus is not an equitable remedy, its issuance is controlled largely by equitable principles. *In re Int'l Profit Assocs., Inc*., 274 S.W.3d 672, 676 (Tex. 2009). "One such principle is that 'equity aids the diligent and not those who slumber on their rights.'" *Id.* (quoting *Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993)). Delay in the filing of a petition for mandamus relief may

---

[7] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon 2017).

[8] *Uduma v. Wagner*, No. 01-12-00796-CV, 2014 WL 4259886, at *8 (Tex. App.—Houston [1st Dist.] 2014, pet. denied.).

waive the right to relief unless the relator can justify the delay. *Id.* To invoke the equitable doctrine of laches, the moving party ordinarily must show that (1) the opposing party unreasonably delayed in asserting its rights and (2) a good faith and detrimental change in the moving party's position because of the delay. *In re Laibe Corp.*, 307 S.W.3d 314, 318 (Tex. 2010).

Wagner asserts, and the record shows, that respondent signed his order granting a new trial on March 27, 2012. On August 24, 2012, Uduma moved to dismiss the claims against her on the ground that Wagner did not timely serve her with an expert report. On August 30, 2013, the Texas Supreme Court held for the first time that a trial court's reasons articulated in a new-trial order are subject to merits-based mandamus review. *See In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 749 (Tex. 2013). On August 27, 2014, this Court issued its opinion in Uduma's interlocutory appeal. *Uduma v. Wagner*, No. 01-12-00796-CV, 2014 WL 4259886, at *8 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Uduma then petitioned for review in the Texas Supreme Court. After the supreme court denied her petition for review, we issued our mandate in the interlocutory appeal on September 4, 2015. Wagner then filed her petition for a writ of mandamus on September 8, 2015.

During the applicable time period from March 27, 2012, when respondent ordered a new trial, to August 24, 2012, when Uduma filed her motion to dismiss,

15

no Texas Court had recognized a right to merits-based mandamus review of a trial court's new-trial order. When Uduma moved to dismiss the claims against her on the ground that she had not been served with an expert report, her motion stayed certain proceedings in the trial court. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(s) (Vernon 2017). Further, Uduma's interlocutory appeal from respondent's order denying her motion to dismiss stayed the commencement of a trial pending resolution of the appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9), (b) (Vernon Supp. 2016); *see also In re Oceanografia, S.A. de C.V.*, 494 S.W.3d 728, 730 (Tex. 2016) (delay in seeking mandamus relief attributable, in part, to pendency of interlocutory appeal). After we resolved the appeal, by issuing our mandate on September 4, 2015, Wagner filed her petition for mandamus relief on the next business day. Thus, Wagner has provided an explanation that justifies her delay in seeking mandamus relief. *See In re Oceanografia, S.A. de C.V.*, 494 S.W.3d at 731 (defendants' explanations sufficient to show they did not "slumber on their rights"); *In re Int'l Profit Associates, Inc.*, 274 S.W.3d at 676.

Moreover, Four J's and Uduma have not shown a detrimental change in their position between the time respondent granted a new trial and Wagner's filing of her mandamus petition in this Court. *See In re Laibe*, 307 S.W.3d at 318; *In re Oceanografia*, 494 S.W.3d at 730 (six-year delay in seeking mandamus relief not unreasonable where plaintiffs showed no prejudice from delay); *In re E.I. du Pont*

*de Nemours & Co.*, 92 S.W.3d 517, 524 (Tex. 2002) (rejecting argument four-year delay barred mandamus relief where plaintiffs had "failed to show how the delay has prejudiced them in any way"). In support of their argument, Four J's and Uduma rely on *Salinas*, in which the appellate court denied mandamus relief to a party who had delayed seeking mandamus relief for over three months. *In re Salinas*, No. 13-09-00599-CV, 2010 WL 196887, at *2 (Tex. App.—Corpus Christi Jan. 20, 2010, orig. proceeding) (mem. op.). There, however, the relator provided no justification for the delay. *Id.*

Accordingly, we hold that Wagner did not waive her right to seek mandamus relief. *See In re Int'l Profit Assocs., Inc.*, 274 S.W.3d at 676; *In re SCI Tex. Funeral Servs., Inc.*, 236 S.W.3d 759, 761 (Tex. 2007).

## Standard of Review

Although trial courts have long been afforded broad discretion in granting new trials, a trial court's discretion to order a new trial is not "limitless." *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 210, 213 (Tex. 2009); *see also* TEX. CONST. art. 1, § 15 (right to trial by jury "shall remain inviolate"); *In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 152 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding) ("[W]e may not substitute our judgment for that of the trial court. But neither may the trial court substitute its judgment for that of the jury in granting a new trial."). Thus, when a trial court orders a new trial after a case has

17

been tried to a jury, the parties "are entitled to an understandable, reasonably specific explanation why their expectations are frustrated by a jury verdict being disregarded or set aside, the trial process being nullified, and the case having to be retried.'" *In re Bent*, 487 S.W.3d 170, 175–76 (Tex. 2016) (quoting *In re Columbia*, 290 S.W.3d at 213).

Accordingly, a trial court, in its order granting a new trial, must state a reason for doing so. *In re Columbia*, 290 S.W.3d at 213. The trial court's "stated reason" must be (1) "legally appropriate," articulating a "well-defined legal standard" or a "defect that probably resulted in an improper verdict," and (2) "specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reason[] from the particular facts and circumstances from the case at hand." *In re Bent*, 487 S.W.3d at 173 (quoting *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688–89 (Tex. 2012) (granting mandamus relief where trial court's order premised on bare assertion new trial warranted "in the interests of justice and fairness")). If the trial court's order granting a new trial satisfies these facial requirements, an appellate court may "conduct a merits review of the bases for [the] new trial order" and "grant mandamus relief '[i]f the record does not support the trial court's rationale for ordering a new trial.'" *In re Bent*, 487 S.W.3d at 173 (quoting *In re Toyota*, 407 S.W.3d at 749); *see also In re United Scaffolding*, 377 S.W.3d at 688–89 (trial court's grant of new trial subject to mandamus review); *In re United*

18

*Servs. Auto. Ass'n*, 446 S.W.3d 162, 170 (Tex. App.—Houston [1st Dist.] 2014, orig. proceeding). We review the merits of a new-trial order under the abuse-of-discretion standard "familiar and inherent in mandamus proceedings." *In re Bent*, 487 S.W.3d at 177–78.

To be entitled to mandamus relief, a relator must demonstrate (1) the trial court clearly abused its discretion and (2) the relator has no adequate remedy by appeal. *In re Reece*, 341 S.W.3d 360, 364 (Tex. 2011). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. *In re Cerberus Capital Mgmt. L.P.*, 164 S.W.3d 379, 382 (Tex. 2005).

Here, we are presented with the issue of whether respondent abused his discretion in concluding that the jury's negative finding as to Arzola's negligence was against the great weight and preponderance of the evidence, a factual-sufficiency question. *See In re United Servs. Auto. Ass'n*, 446 S.W.3d at 170; *see also In re Baker*, 420 S.W.3d 397, 402 (Tex. App.—Texarkana 2014, orig. proceeding); *In re Zimmer, Inc.*, 451 S.W.3d 893, 905 (Tex. App.—Dallas 2014, orig. proceeding) ("[W]e see no reason to believe the standards for factual sufficiency review in new trial mandamus proceedings should differ from the standards of review on appeal.").

When a party attacks the factual sufficiency of an adverse finding on an issue on which it did not have the burden of proof, the party must demonstrate that the adverse finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). In conducting a factual-sufficiency review, we must examine, consider, and weigh all of the evidence that supports or contradicts the jury's finding. *See Francis*, 46 S.W.3d at 242; *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). In doing so, we note that the jury is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). When presented with conflicting testimony, the fact finder may believe one witness and disbelieve others, and it may resolve inconsistencies in the testimony of any witness. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

## New Trial

In her sole issue, Wagner argues that respondent abused his discretion in granting Four J's and Uduma a new trial because the evidence is factually sufficient to support the jury's finding that Arzola's negligence, if any, in starting the fire did not proximately cause Jenny's injuries.

The elements of a negligence cause of action consist of the "existence of a legal duty, a breach of that duty, and damages *proximately caused* by the breach." *Gharda USA, Inc. v. Control Sols., Inc*., 464 S.W.3d 338, 352 (Tex. 2015) (emphasis added); *LeBlanc v. Palmer*, No. 01-15-00034-CV, 2015 WL 7261532, at *2 (Tex. App.—Houston [1st Dist.] Nov. 17, 2015, pet. denied) (mem. op.). The components of proximate cause are (1) cause-in-fact and (2) foreseeability. *Ryder Integrated Logistics, Inc. v. Fayette Cty.*, 453 S.W.3d 922, 929 (Tex. 2015); *LeBlanc*, 2015 WL 7261532, at *2. Cause-in-fact requires proof "that an act or omission was a substantial factor in bringing about injury which would not otherwise have occurred." *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd*., 896 S.W.2d 156, 161 (Tex. 1995). Foreseeability exists when "the actor as a person of ordinary intelligence should have anticipated the dangers his negligent act creates for others." *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002).

In Question One of his charge, respondent asked the jury, "Did the negligence, if any, of those named below [Four J's, Uduma, and Arzola] *proximately cause* the injuries in question?" (Emphasis added.) Respondent instructed the jury that

> "'Negligence" means failure to use ordinary care—that is, failing to do that which a person or company of ordinary prudence would have done under the same or similar circumstances, or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

21

"Ordinary care" means that degree of care that would be used by a person or company of ordinary prudence under the same or similar circumstances.

. . . .

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

"New and independent cause" means the act or omission of a separate and independent agency, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question and thereby becomes the immediate cause of such occurrence.

In granting Four J's and Uduma's motion for new trial, respondent concluded that

the jury's failure to find negligence on [Arzola], who started the fire that was the cause-in-fact of the injuries to [Wagner] and the death of [James], is so against the great weight of the evidence as to be clearly wrong and manifestly unjust.

Respondent's stated reason, which points to the evidence that Arzola started the fire, is "specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reason[] from the particular facts and circumstances from the case at hand." *See In re Bent*, 487 S.W.3d at 173 (quoting *In re United Scaffolding*, 377 S.W.3d at 688–89). However, respondent's stated reason is not one for which a new trial is "legally appropriate" because the evidence that Arzola "started the fire that was the cause-in-fact of the injuries" does

22

not undermine the challenged jury's finding. *See In re United Scaffolding, Inc.*, 377 S.W.3d at 689 ("[M]ere recitation of a legal standard, such as a statement that a finding is against the great weight and preponderance of the evidence, will not suffice. The order must . . . explain how the evidence (or lack of evidence) undermines the jury's findings."). A finding of negligence requires a showing of proximate cause, i.e., both cause-in-fact and foreseeability. *Gharda USA*, 464 S.W.3d at 352; *Fayette Cty.*, 453 S.W.3d at 929. Thus, cause-in-fact is merely one component. *Fayette Cty.*, 453 S.W.3d at 929. Accordingly, we hold that respondent's new-trial order does not satisfy the facial requirements of *In re Bent*. *See In re Bent*, 487 S.W.3d at 173.

Even were we to conclude that respondent's new-trial order satisfies the facial requirements of *In re Bent*, the record does not support respondent's rationale for ordering a new trial. *See id.*; *In re Toyota*, 407 S.W.3d at 749; *In re United Servs. Auto Ass'n*, 446 S.W.3d at 176–77 ("Even if the order satisfied *United Scaffolding*," new trial improper because jury verdict not against great weight and preponderance of evidence). The jury heard ample evidence from which it could have reasonably concluded that Arzola's act in starting the fire was not the proximate cause of Jenny's injuries. *See Fayette Cty.*, 453 S.W.3d at 929; *Yap v. ANR Freight Sys., Inc.*, 789 S.W.2d 424, 425–26 (Tex. App.—Houston [1st Dist.] 1990, no pet.) ("The question of proximate cause is one of fact particularly within the province of the

jury, and a jury finding on proximate cause will be set aside only in the most exceptional circumstances.").

Uduma herself testified that she and Four J's, prior to the fire, were aware that Arzola had been diagnosed with bipolar disorder, had tried to commit suicide, and had a history of violence toward the staff. Uduma's testimony, along with Arzola's psychological evaluation and "Annual Individual Service Plan," which Four J's had completed the month before the fire, establish that Arzola, as a child, had been emotionally, physically, and sexually abused, which included her being compelled into prostitution by her biological parents. She had a history of alcohol and narcotics abuse; numerous placements in residential treatment centers; and "multiple contacts" with the Dallas Juvenile Justice Department for running away, evading arrest, prostitution, probation violations, and assault. Further, Arzola had a long history of behavioral issues, including breaking windows and light fixtures; attempting to leap from moving vehicles; swallowing objects; wrapping ligatures around her throat; biting herself and others; and "headbanging," choking, stabbing, and bludgeoning others.

Four J's characterized Arzola's behavioral problems as "severe," requiring multiple psychotropic medications to manage. They were "typically occasioned by staff making requests of her, delaying or denying her tangibles or services," or "dividing their time" between Arzola and others. Because Arzola's aggression

24

might result in injury to herself and others, Four J's directed that staff "[k]eep all sharps, medications, and poisons" in locked storage. Regardless, according to Uduma's testimony, Four J's allowed Arzola to smoke cigarettes, and it did not perform room inspections for contraband. Obichuku also testified that Four J's allowed its residents to take "smoking breaks," during which the staff "issued out the lighters." And the staff was responsible for collecting the lighters "after the clients were done."

Kern, Wagner's expert, testified that Four J's breached the standards of care applicable to a residential care provider by not providing adequate staff at the facility; not providing adequate supervision; not conducting room inspections; and, based on her history, allowing Arzola to have access to an incendiary device, i.e., a cigarette lighter. He explained that persons like Arzola are unable to "realize the consequences of their actions at the time that they are upset."

Uduma did opine that Arzola alone was responsible for the injuries that resulted from the fire because Arzola was "a competent adult who was only mild[ly] mental[ly] retarded" and law-enforcement authorities had arrested Arzola for arson. However, the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *See Jackson*, 116 S.W.3d at 761.

Four J's and Uduma's own evidence shows that prior to the fire, they were aware of the extent of Arzola's behavioral issues, the dangers she posed to herself

25

and others, and that she was not capable of governing herself. Nevertheless, they not only allowed Arzola to have access to cigarette lighters, but they also supplied them to her. And Four J's had itself concluded that Arzola's behavioral problems were "severe" and "typically occasioned" by staff "dividing their time" between her and other residents. Nevertheless, it assigned Udemezue to work alone at the facility, and she had to divide her time among Arzola and three other residents—two of whom required "total care."

Moreover, the back door of the facility had a deadbolt lock that required a key to open it from the inside, the door was kept locked, and staff members did not have a key. Kern opined that the keyed deadbolt lock on the back door, to which even the staff members did not have a key, did not meet the standard of care for a four-bedroom residential facility. He further opined that Four J's should have installed a fire-sprinkler system at the facility, conducted "third shift [fire] drill[s]," and trained its staff in the use of a fire extinguisher. And Kern explained that Four J's did not provide adequate staff at the facility, did not provide adequate supervision, and did not conduct room inspections.

Udemezue testified that by the time she discovered that Arzola had set fire to her bedroom, the flames were very close to the front door. And although she went back inside the facility toward Jenny's and James's rooms to try to rescue them, she panicked when she realized that she had only "one exit." She did not have a key to

26

the back door, and the garage door did not function. With access to only one door to the outside, Udemezue knew that "[i]f the fire g[ot] to that front door, that's it." They were "finished." She "would have tried [her] best if [she had] had another door in that house." And the outcome would have been better had she had assistance from at least one other staff member. Although Four J's did provide Udemezue with fire-emergency training on two occasions, she, in both drills, was trained to exit "through the front door." And neither drill involved the use of a fire extinguisher or placing Jenny in a blanket to evacuate her from the facility.

Irondi also testified that there was no key available to the back door of the facility, and she had reported it lost to Four J's at least seven months before the fire. She further noted that Four J's had not provided her with any fire-emergency training.

Although Obichuku testified that she had trained Udemezue to implement Jenny's individual evacuation plan and Udemezue simply did not follow her training during the fire, it was within the province of the jury to resolve conflicts in the testimony. *See McGalliard*, 722 S.W.2d at 697. The jury could have disbelieved Obichuku and believed Udemezue's testimony that the outcome would have been better had she had "another door in that house," another staff member to help her, or been adequately trained to handle a fire emergency. *See Jackson*, 116 S.W.3d at 761

27

(fact finder is sole judge of credibility of witnesses and weight given their testimony).

"The question of proximate cause is one of fact particularly within the province of the jury. . . ." *Yap*, 789 S.W.2d at 425–26. From the evidence, the jury could have reasonably concluded, as it did, that Jenny's injuries were proximately caused by Four J's and Uduma's breaches of the standards of care applicable to a residential care provider, namely, in supplying Arzola with an incendiary device, i.e., a cigarette lighter, not conducting room inspections, not providing adequate supervision of the residents, not providing adequate staff at the facility, not training staff on how to use a fire extinguisher, and not providing staff with keys to the back door, thereby preventing Jenny's timely escape.

Having considered all of the evidence, both that which supports and that which contradicts the jury's finding that Arzola's negligence, if any, in starting the fire did not proximately cause Jenny's injuries, we conclude that there is ample evidence to support the jury's finding. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Thus, the jury's finding is not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Francis*, 46 S.W.3d at 242; *In re United Servs. Auto Ass'n*, 446 S.W.3d at 173–74.

Accordingly, we hold that respondent abused his discretion in ordering a new trial on the ground that the evidence is factually insufficient to support the jury's finding that Arzola's negligence, if any, in starting the fire did not proximately cause Jenny's injuries. *See In re Baker*, 420 S.W.3d at 404 ("[T]he grant of the new trial improperly intruded on the jury's province.").

## Adequate Remedy by Appeal

Wagner argues that she has no adequate remedy by appeal because requiring a new trial will waste significant time and money and she may lose her right to a judgment on the first verdict.

The Texas Supreme Court has explained that "absent mandamus review," parties "will seemingly have no appellate review" of orders granting new trials. *See In re Columbia*, 290 S.W.3d at 209. Even if a party could obtain appellate review of a new-trial order following a second trial, it could not obtain reversal of an unfavorable verdict unless it convinced an appellate court that the granting of the new trial constituted harmful error. *Id.* Furthermore, even if an unfavorable verdict were reversed and rendered in the party's favor, "it would have lost the benefit of a final judgment based on the first jury verdict without ever knowing why, and would have endured the time, trouble, and expense of the second trial." *Id.* at 209–10. Thus, parties do not have an adequate appellate remedy. *Id.* at 210.

Accordingly, we hold that Wagner has no adequate remedy by appeal. *See id.*; *see also In re Toyota*, 407 S.W.3d at 762; *In re United Servs. Auto Ass'n*, 446 S.W.3d at 180 (granting mandamus relief where trial court's reasons for ordering new trial not "legally appropriate" or grounded in facts of case).

## Conclusion

Because respondent abused his discretion in granting Four J's and Uduma's motion for new trial and Wagner does not have an adequate remedy by appeal, we conditionally grant Wagner's petition for a writ of mandamus and direct respondent to vacate his order granting a new trial. A writ from this Court will issue only if respondent does not comply.

Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Jennings, J., concurring.