**Opinion issued December 31, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00136-CV

————————————

**TONYA BAUER, AS GUARDIAN OF THE PERSON AND ESTATE OF EMILY BAUER, AN INCAPACITATED PERSON, Appellant**

**V.**

**GULSHAN ENTERPRISES, INC, Appellee**

---

**On Appeal from the 190th District Court
Harris County, Texas
Trial Court Case No. 2014-71024-B**

---

## OPINION ON REHEARING

Appellant, Tonya Bauer, as guardian of the person and the estate of Emily Bauer, an incapacitated person ("Bauer"), filed a motion for rehearing and for en banc reconsideration of our opinion issued on February 27, 2020. We deny the

motion for rehearing, but withdraw our opinion and judgment, and substitute this opinion and judgment in their stead. Because we issue a new opinion in connection with the denial of rehearing, the motion for en banc reconsideration of our prior opinion is moot.[1]

The term "synthetic cannabinoid," commonly called "synthetic marihuana," refers to a class of chemical compounds created to mimic the effects of tetrahydrocannabinol (THC), the psychoactive constituent of the marihuana plant.[2] Synthetic cannabinoids are man-made, unregulated chemicals produced in underground labs, often overseas, and then shipped to the United States in powdered or crystal form.[3] The chemicals are then mixed with acetone and manually sprayed onto plant material before packaging. As laws are enacted making it illegal to sell,

---

[1]     *See In re Wagner*, 560 S.W.3d 309, 312 (Tex. App.—Houston [1st Dist.] 2017, orig. proceeding [mand. denied]); *Richardson–Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 472 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 33, 40 n.2 (Tex. App.—Houston [1st Dist.] 2004, pet. denied); *see also Gulf Coast Ctr. v. Curry*, No. 01-18-00665-CV, 2020 WL 5414983, at *1 (Tex. App.—Houston [1st Dist.] Sept. 10, 2020, no pet.) (mem. op. on reh'g); *State v. Gleannloch Commercial Dev., LP*, No. 14-16-00037-CV, 2018 WL 1189123, at *1 (Tex. App.—Houston [14th Dist.] Mar. 8, 2018, pet. denied) (mem. op.).

[2]     NAT'L INST. ON DRUG ABUSE, DRUG FACTS: WHAT ARE SYNTHETIC CANNABINOIDS? (Feb. 2018), https://www.drugabuse.gov/publications/drugfacts/synthetic-cannabinoids-k2spice.

[3]     OFFICE OF THE ATTORNEY GEN. OF TEX., AGENCY INITIATIVES, SYNTHETIC DRUGS, https://www2.texasattorneygeneral.gov/initiatives/synthetics/.

2

buy, or possess certain chemicals, manufacturers simply alter their formulas.[4] As a result, the composition of many of these products, some of which contain lethal contaminants, is largely unknown, making it difficult for healthcare professionals to diagnose and treat patients in emergency cases involving these substances.[5]

For several years, synthetic cannabinoids have been sold in convenience stores, novelty stores, and over the internet.[6] They are marketed in colorful packages to attract young consumers.[7] Currently, sixty percent of individuals admitted to Texas emergency rooms for treatment related to synthetic-cannabinoid use are between the ages of 12 and 20.[8] This is such a case.

Here, a teenage girl suffered debilitating, permanent injuries after using synthetic marihuana that a friend obtained from a convenience store. Appellant, Tonya Bauer, as guardian of the person and the estate of Emily Bauer, an incapacitated person ("Bauer"), brought negligence claims against the convenience-

---

[4]   NAT'L INST. ON DRUG ABUSE, DRUG FACTS: WHAT ARE SYNTHETIC CANNABINOIDS? (Feb. 2018), https://www.drugabuse.gov/publications/drugfacts/synthetic-cannabinoids-k2spice.

[5]   *Id.*; OFFICE OF THE ATTORNEY GEN. OF TEX., AGENCY INITIATIVES, SYNTHETIC DRUGS, https://www2.texasattorneygeneral.gov/initiatives/synthetics/.

[6]   U.S. DEP'T OF JUSTICE, DRUG ENF'T AGENCY, DRUGS OF ABUSE, at 88–89 (2017 ed.), https://www.dea.gov/documents/2017/06/15/drugs-abuse.

[7]   NAT'L INST. ON DRUG ABUSE, DRUG FACTS: WHAT ARE SYNTHETIC CANNABINOIDS? (Feb. 2018), https://www.drugabuse.gov/publications/drugfacts/synthetic-cannabinoids-k2spice.

[8]   OFFICE OF THE ATTORNEY GEN. OF TEX., AGENCY INITIATIVES, SYNTHETIC DRUGS, https://www2.texasattorneygeneral.gov/initiatives/synthetics/.

store owner, the lessee, and the entities that supplied the convenience store gas pumps with gasoline. In this appeal, Bauer challenges the trial court's summary judgment in favor of the gasoline distributor, appellee, Gulshan Enterprises, Inc. ("Gulshan"). In her sole issue, Bauer contends that the trial court erred in granting summary judgment for Gulshan, and denying her motion for reconsideration, because she presented evidence raising genuine issues of material fact. Because we conclude that there is simply no evidence to support the duty element of Bauer's negligence claim against the gasoline distributor, we affirm the trial court's judgment.

## Background

ConocoPhillips Company ("ConocoPhillips")[9] is engaged in the production, refining, and marketing of petroleum products under various brands. Gulshan is a wholesale distributor of motor vehicle fuels to independent dealers ("dealers") and to retail outlets, i.e., gas stations. On March 1, 2010, ConocoPhillips and Gulshan entered into a supply agreement, the "Branded Marketer Agreement" ("BMA"). Under its terms, ConocoPhillips agreed to sell gasoline to Gulshan, as "Marketer," for resale to Gulshan's customers. The BMA authorized Gulshan to sell ConocoPhillips-branded gasoline through stations it owns or operates and to sell gasoline to independent dealers who own or operate such stations.

---

[9]     ConocoPhillips is not a party to this appeal.

4

In the BMA, ConocoPhillips also granted Gulshan a license to use certain ConocoPhillips brand names in the advertising, distribution, and sale of gasoline and to display ConocoPhillips brand identification and signage at the stations Gulshan supplied. Noting that ConocoPhillips had a protectable business interest in ensuring that Gulshan's sales and distributions would be accomplished in a manner respecting the standards, reputation, and integrity of the ConocoPhillips brands, the BMA set out certain "Brand and Image Standards," discussed below, with which Gulshan was required to comply. Gulshan was also required to ensure to ConocoPhillips that each of the dealers and gas stations that it supplied also complied. The parties agreed that the BMA was "personal to [Gulshan]" and for the sole use and benefit of Gulshan and ConocoPhillips. The parties agreed that, in the event that Gulshan failed to comply, or to ensure compliance, with the Brand and Image Standards, ConocoPhillips could assess fees against Gulshan, "debrand" the gas station, or terminate the BMA.

On January 31, 2012, Gulshan executed a Marketing Contract with an independent dealer, Bin Enterprises Inc. ("Bin").[10] Also on that day, Bin purchased from Global New Millennium Partners, Ltd.[11] a convenience store and gas station located at 11150 Huffmeister Road in Houston, known as Handi-Stop #79 ("Handi-

---

[10]    Bin is not a party to this appeal.

[11]    Global New Millenium Partners, Ltd. is not a party to this appeal.

5

Stop"). Under the terms of the Marketing Contract, Gulshan agreed to supply Bin with ConocoPhillips gasoline, branded as "Phillips 66," at Bin's locations, including Handi-Stop. And, Bin agreed to operate in accordance with the standards of Gulshan and its supplier. In the Marketing Contract, the parties expressly agreed that Gulshan was to have no right of control over Bin's operation of its businesses, including Handi-Stop. In October 2012, Bin leased Handi-Stop to Khalid Khan.

During the fall of 2012, Shawn Kettlewell and Emily Bauer were sophomores in high school. According to Shawn, he and Emily frequently smoked marihuana together and, on occasion, they used cocaine, Xanax, and ecstasy. On December 7, 2012, they skipped school and smoked marihuana periodically throughout the day. Late that afternoon, a friend, Anserra Dupree, Jr., went to Handi-Stop and purchased synthetic marihuana, specifically, one bag of "Kush"[12] and one bag of "Klimax." Shawn, Emily, and Anserra then gathered with friends and smoked approximately half of the contents of each bag. According to Anserra, Emily generally "added other things when she smoked."

---

[12] *See* TEX. HEALTH & SAFETY CODE § 481.1031 (designating certain synthetic chemical cannabinoids as controlled substances); *see also In re T.B.V.J.*, No. 01-17-00892-CV, 2018 WL 1747264, at *1 (Tex. App.—Houston [1st Dist.] Apr. 12, 2018, pet. denied) (mem. op.); *A.R. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00185-CV, 2015 WL 4909908, at *1 n.4 (Tex. App.—Austin 2015, no pet.) (mem. op.) (noting that kush is a mixture of herbs and spices "sprayed with synthetic compounds that mimic the effects of controlled substances like ecstasy and meth").

After smoking synthetic marihuana at around 7:00 p.m., Emily began feeling dizzy and had a headache. She took prescribed medication and went to sleep. When she awoke 15 minutes later, she began mumbling, screaming, and throwing things. After she bit Shawn, he called for emergency assistance. Emily was taken by ambulance to North Cypress Medical Center. Shawn discarded the remaining portions of the synthetic marihuana that he and Emily had smoked.

At the hospital, Emily was disoriented, screamed for people who were not there, thrashed violently, and bit the siderails of her bed. According to the medical evidence, Emily exhibited clinical signs and symptoms consistent with synthetic cannabinoid toxicity. She was placed in a medically-induced coma and on a ventilator. She suffered multiple ischemic strokes and was diagnosed with primary central nervous system vasculitis. She developed quadriparesis, cortical visual impairment, and a seizure disorder. Emily spent months in the hospital and underwent therapy before returning home. Emily's medical issues are ongoing. She requires near constant supervision and requires assistance to perform basic tasks. The cost of caring for Emily for the rest of her life is estimated to be between $10,822.665.99 and $12,262,949.30.

Bauer, Emily's mother, brought claims against "Phillips 66 Company,"[13] Gulshan, Bin, and Khan for products liability, negligence, fraud, breach of implied

---

[13]    In 2012, Phillips 66 Company became an independent company.

warranty of merchantability, and intentional infliction of emotional distress. The trial court granted summary judgment in favor of Phillips 66 Company, dismissing Bauer's claims against it. The trial court also granted summary judgment in favor of Gulshan on Bauer's products-liability claims. Bauer non-suited all of her other claims, except her negligence claim. The trial court severed Bauer's negligence claim against Gulshan from her claims against Bin and Khan. This appeal concerns only Bauer's negligence claim against Gulshan.

In her negligence claim against Gulshan, Bauer alleged that Gulshan owed Emily a duty of reasonable care not to create an unreasonable risk of harm. She asserted that the BMA assigned contractual duties to Gulshan to monitor and inspect the activities at Handi-Stop to ensure that the "sale or use of illegal drugs or drug paraphernalia [did] not occur." And, Gulshan breached these duties by failing to perform its duties of monitoring and inspecting the store. She asserted that, although Gulshan apparently conducted some type of inspections of Handi-Stop, Gulshan did not perform inspections inside the retail store after January 31, 2012, and such failure to exercise reasonable care proximately caused Emily's harm. Bauer further asserted that Gulshan's conduct constituted a "negligent undertaking" giving rise to a duty to Emily because it performed services that it knew, or should have known, were necessary for her protection. Bauer asserted that Gulshan failed to exercise reasonable care in performing those services, that Emily suffered harm based on her

8

reliance on Gulshan's performance, and that Gulshan's performance increased Emily's risk of harm.

Bauer also alleged that Gulshan was vicariously liable for the negligence of Bin and Khan. She asserted that "Gulshan was the owner/operator of Handi-Stop," that Bin and Khan acted as Gulshan's agents, and that Bin and Khan negligently performed their duties to monitor and inspect the store. Bauer further alleged that Gulshan was grossly negligent.

Gulshan filed a combined motion for traditional and no-evidence summary judgment on Bauer's negligence claim. Gulshan argued that it was entitled to judgment as a matter of law because the trial court had previously granted summary judgment in favor of Gulshan on Bauer's products-liability claims, and Bauer had simply recast her products-liability claims as an artfully plead negligence claim.

Gulshan further argued, as pertinent here, that there was no evidence that it "breached any duty allegedly owed to Emily or that its conduct caused [her] harm." Gulshan did not own or operate Handi-Stop, had no contractual right to control Handi-Stop, and did not exercise any control over it. In addition, there was no evidence that it undertook to perform any services, failed to exercise reasonable care in performing any services, that Emily suffered harm based on her reliance on Gulshan, or that Gulshan's performance increased Emily's risk of harm.

9

In her summary-judgment response, Bauer argued that Gulshan owed Emily a duty of reasonable care based on its contractual duties under the BMA. She asserted that, "[u]nder the BMA, Gulshan held the right to (1) control activities taking place on the premises where Emily's injuries arose, (2) inspect the premises for offensive and illegal activities, and (3) direct the conduct of those working on or around the premises." Bauer asserted that the BMA "alerted Gulshan and put them on notice to criminal risks that were attendant to this type of business." And, "[t]o that end, the BMA assigned Gulshan a duty—and Gulshan undertook that duty—to prevent the 'sale or use of illegal drugs or drug paraphernalia' at any of the Phillips 66-branded fuel stations it serviced including Handi-Stop." Bauer asserted that there was substantial evidence that Gulshan "controlled the activities on the premises, failed to exercise reasonable care in the exercise of that control, and, as a direct result," Emily was injured.

As her summary-judgment evidence, discussed below, Bauer presented the BMA, the Marketing Contract, a photograph of packages of synthetic marihuana, and various letters. She also attached excerpts of her deposition, the transcript of a recorded statement of Anserra, and the depositions of Shawn, Shoukat Dhanani (president of Gulshan), and Salman Bin Hameed (president of Bin). Bauer also attached medical records, medical expert reports, and excerpts of the depositions of Drs. Greg Andres and Jeff Lapoint.

After a hearing, trial court granted summary judgment in favor of Gulshan without specifying the grounds and dismissed Bauer's claim against it. Bauer filed a motion for reconsideration, again arguing that the summary-judgment evidence presented issues of fact. The trial court denied Bauer's motion for reconsideration.

## Summary Judgment

In her sole issue, Bauer argues that the trial court erred in granting Gulshan's motion for no-evidence summary judgment on her negligence claim, under both simple-negligence and negligent-undertaking theories, because she presented more than a scintilla of evidence on each of the challenged elements of her claim. *See* TEX. R. CIV. P. 166a(i). Bauer argues that the trial court erred in granting Gulshan's motion for traditional summary judgment on her negligence claim because Gulshan did not conclusively establish that she simply recast her products-liability claim as a negligence claim. *See* TEX. R. APP. P. 166a(c). She further asserts that the trial court erred in denying her motion for reconsideration on the same grounds.

### A.    *Standard of Review*

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). In conducting our review, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Id.* If a trial court grants summary judgment without specifying the grounds for granting the motion,

11

we must uphold the trial court's judgment if any of the asserted grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.— Houston [1st Dist.] 2005, pet. denied).

A party seeking summary judgment may combine in a single motion a request for summary judgment under both the traditional and no-evidence standards. *Binur v. Jacobo*, 135 S.W.3d 646, 650–51 (Tex. 2004). When a party seeks summary judgment on both grounds in the trial court and the trial court's order does not specify its reasons for granting summary judgment, we first review the propriety of the summary judgment under the no-evidence standard. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *see also* TEX. R. CIV. P. 166a(i). If we conclude that the trial court did not err in granting summary judgment under the no-evidence standard, we need not reach the issue of whether the trial court erred in granting summary judgment under the traditional standard. *See Ford Motor Co.*, 135 S.W.3d at 600; *see also* TEX. R. CIV. P. 166a(c).

To prevail on a no-evidence summary-judgment motion, the movant must establish that there is no evidence to support an essential element of the non-movant's claim on which the non-movant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.— Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the non-movant to present evidence raising a genuine issue of material fact as to each of the elements

12

challenged in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). A no-evidence summary judgment may not be granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements. *See Ridgway*, 135 S.W.3d at 600. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

In a traditional motion for summary judgment, the movant has the burden to establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). When a defendant moves for a traditional summary judgment, it must either: (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of an affirmative defense, thereby defeating the plaintiff's cause of action. *See Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). Once the movant meets its burden, the burden shifts to the non-movant to raise a genuine issue of material fact precluding summary judgment. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their

13

conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

Generally, we restrict the scope of our review of a trial court's ruling on a motion for summary judgment to that evidence that was before the trial court at the time that it ruled on the motion. *Neely v. Comm'n for Lawyer Discipline*, 302 S.W.3d 331, 347 n.16 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *see also* TEX. R. CIV. P. 166a(d). "When a motion [to reconsider] is filed after the rendition of summary judgment, a trial court has the discretion to consider the grounds in [the] post-judgment motion and supporting proof[,] and reaffirm its summary judgment based on the entire record." *Charbonnet v. Shami*, No. 04-12-00711-CV, 2013 WL 2645720, at *5 (Tex. App.—San Antonio June 12, 2013, pet. denied) (mem. op.) (internal quotations omitted). "The trial court also has the discretion to simply deny a motion filed after the entry of summary judgment without considering its substance." *Id.* "In the latter situation, an appellate court need only consider arguments and evidence presented prior to the summary-judgment hearing." *Id.*

When, as here, however, the trial court's order affirmatively states that it considered the evidence attached to a motion to reconsider, we review the summary judgment based on the grounds and proof in both the prejudgment and post-judgment filings. Timothy Patton, Summary Judgments in Texas § 7.06[1] (3d ed. 2013); *see also Circle X Land & Cattle Co., Ltd. v. Mumford Ind. Sch. Dist.*, 325 S.W.3d 859,

14

863 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (reviewing evidence attached to motion to reconsider because order reflected that trial court considered such evidence); *Stephens v. Dolcefino*, 126 S.W.3d 120, 134 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (considering evidence offered at hearing on motion to reconsider because trial court ruled that it would consider such evidence); *cf. McMahan v. Greenwood*, 108 S.W.3d 467, 500 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (declining to consider evidence attached to motion for new trial because trial court's order did not state that it considered such evidence).

## B.     *Legal Principles*

The common-law doctrine of negligence consists of: (1) a legal duty owed by one person to another, (2) a breach of that duty, and (3) damages proximately resulting from the breach. *Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998). The threshold inquiry is the existence of a duty. *Id.* A duty is a "legally enforceable obligation to comply with a certain standard of conduct." *Hand v. Dean Witter Reynolds, Inc.*, 889 S.W.2d 483, 491 (Tex. App.—Houston [14th Dist.] 1994, writ denied). "Texas law generally imposes no duty to take action to prevent harm to others absent certain special relationships or circumstances." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000) (citing Restatement (Second) of Torts § 314 (1965) ("The fact that [an] actor realizes or should realize that action on his

15

part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.")).

Special relationships include those existing between employer and employee, parent and child, and independent contractor and contractee. *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990); *see also Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287, 289–90, 292 (Tex. 1996) ("There are some cases in which a duty exists as a matter of law because a special relationship exists between the parties. In such cases, the duty analysis ends there.").

"It is firmly established in Texas that the existence and elements of a common law duty are ordinarily legal issues for the court to decide. . . ." *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 181 (Tex. 2004). Because the existence of a legal duty is a question of law, we apply a de novo standard of review. *Alcoa, Inc. v. Behringer*, 235 S.W.3d 456, 460 (Tex. App.—Dallas 2007, pet. denied). In deciding whether to impose a duty, a court must balance the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *Humble Sand & Gravel*, 146 S.W.3d at 182. Courts also consider whether one party "would generally have superior knowledge of the risk or a right to control the actor who caused the harm." *Id*.

16

"The critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant *acted* in a way that requires the imposition of a duty where one otherwise would not exist." *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (emphasis added). "[O]ne who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured thereby." *Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 395 (Tex. 1991) (quoting *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119–20 (Tex. 1976)). With respect to liability to a third person, the Restatement (Second) of Torts section 324A, "Liability to Third Person for Negligent Performance of Undertaking," provides:

> *One who undertakes*, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform] his undertaking, if
> (a)  his failure to exercise reasonable care increases the risk of such harm, or
> (b)  he has undertaken to perform a duty owed by the other to the third person, or
> (c)  the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 324A (1965) (emphasis added).

In its most recent case discussing section 324A, the Texas Supreme Court stated that "an undertaking claim requires the trial court to instruct the jury that a defendant is negligent only if: (1) the defendant *undertook to perform* services that

17

it knew or should have known were necessary for the plaintiff's protection; (2) the defendant failed to exercise reasonable care in performing those services; and either (a) the plaintiff relied upon the defendant's performance, or (b) the defendant's performance increased the plaintiff's risk of harm." *Nall*, 404 S.W.3d at 555–56 (emphasis added) (citing *Torrington Co.*, 46 S.W.3d at 838–39 and RESTATEMENT (SECOND) OF TORTS § 324A (providing rule for liability to third person for negligent performance of undertaking)).

Thus, a duty arises if the defendant affirmatively undertakes to perform services upon which reliance can be based. *See id.* (citing *Osuna v. S. Pac. R.R.*, 641 S.W.2d 229, 230 (Tex. 1982) ("Having undertaken to place a flashing light at the crossing for the purpose of warning travelers, the railroad was under a duty to keep the signal in good repair, even though the signal was not legally required.")). "A mere promise to render a service coupled with neither performance nor reliance imposes no tort obligation upon the promisor." *Fort Bend Cty. Drainage Dist.*, 818 S.W.2d at 396.

**C.  *Analysis***

Here, Gulshan, in its summary-judgment motion, argued that there is no evidence that it "breached any duty allegedly owed to Emily or that its conduct caused [her] harm." *See* TEX. R. APP. P. 166a(i).  Thus, Gulshan challenged each of the elements of Bauer's negligence claim. *See Lampasas v. Spring Ctr., Inc.*, 988

18

S.W.2d 428, 436 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *see also* TEX. R. CIV. P. 71 (providing that courts are to give effect to substance of motion rather than title or form); *In re J.Z.P.*, 484 S.W.3d 924, 925 (Tex. 2016).

Gulshan further argued that there is no evidence that it undertook any action that caused Emily's harm. Specifically, there is no evidence that Gulshan performed services that it knew or should have known were necessary for Emily's protection; that it failed to exercise reasonable care in performing any such services; or either that Emily's reliance upon Gulshan's performance caused her injury or that Gulshan's alleged performance increased Emily's harm. *See* TEX. R. APP. P. 166a(i); *Nall*, 404 S.W.3d at 555–56.

Bauer, in her summary-judgment response, with respect to the duty element of her claim, argued that Gulshan owed Emily a duty of reasonable care based on (1) Gulshan's contractual duties under the BMA and control over Handi-Stop (simple-negligence theory) and (2) having affirmatively undertaken to inspect and monitor Handi-Stop (negligent-undertaking theory).

### 1. *Simple Negligence*

Bauer first argued that the BMA assigned a contractual duty to Gulshan to "prevent the 'sale or use of illegal drugs or drug paraphernalia' at any of the Phillips 66-branded outlets it serviced including Handi-Stop." And, Gulshan agreed to maintain "extensive control" over Handi-Stop. Thus, Gulshan assumed a duty to

Emily, arising in tort, to exercise reasonable care in inspecting and monitoring the store.

The BMA provides that ConocoPhillips had a protectable business interest in ensuring that Gulshan's distribution of branded products was accomplished in a manner consistent with ConocoPhillips' standards, reputation, and integrity. Thus, section 5 of the BMA, "Brand and Image Standards," requires that Marketers, i.e., Gulshan, and its Marketer Supplied Outlets, i.e., Handi-Stop, uphold certain standards reflecting on the reputation of ConocoPhillips. These include treating all persons fairly, honestly, and courteously; providing efficient service to consumers; properly addressing consumer complaints; keeping the building and grounds clean; operating with well-groomed personnel; and operating during certain business hours. In addition, section 5(D), on which Bauer relies, provides:

> Consistent with the principles herein set forth, . . . Marketer [Gulshan] shall conduct its independent business operations in compliance with the standards set forth below, which will promote the continuing good reputation of ConocoPhillips and all other branded ConocoPhillips marketers. *[Gulshan] shall ensure to ConocoPhillips* that all Marketer Supplied Outlets [such as Handi-Stop] and the Marketer Supplied Dealers [Bin] shall also comply with these standards.
> . . . .
> (D)  Each Marketer Supplied Outlet [Handi-Stop] must complement the community and the environment. Furthermore, [Handi-Stop] must not engage, permit, or cooperate in any conduct that reflects unfavorably on the reputation of ConocoPhillips in the community served by [Gulshan], or in ConocoPhillips' opinion impairs the goodwill associated with the ConocoPhillips   . . . . [Gulshan] shall cooperate, and shall take reasonable steps to

20

ensure that the operators of [Handi-Stop] . . . its employees, vendors, contractors, and agents cooperate fully with the performance of [Gulshan's] obligations under this [BMA] . . . . [Gulshan] shall not permit on, in[,] or from [Handi-Stop]:

i.      price gouging . . . ;

ii.     any illegal consumption of intoxicating beverages;

iii.    *the sale or use of illegal drugs or drug paraphernalia*;

iv.    the sale of tobacco . . . or alcoholic beverages to minors . . . ;

v.      any offensive merchandise . . . .

(Emphasis added.) Thus, under the BMA, in order to protect the reputation and goodwill of ConocoPhillips, Gulshan had a duty to ensure ConocoPhillips that the gas stations it serviced, such as Handi-Stop, cooperated and complied with ConocoPhillips's standards, such as prohibiting the sale of illegal drugs or drug paraphernalia.

Bauer argued that Gulshan owed these duties to Emily based on the following language in section 5: "Marketer specifically understands and agrees that the Brand and Image Standards are reasonable and of material significance to this Agreement and to the consumers who patronize Marketer Supplied Outlets. . . ." The BMA reflects, however, that it constitutes an agreement between ConocoPhillips and Gulshan, and section 36 expressly provides: "This agreement is personal to [Gulshan] and is intended for the sole use and benefit of [Gulshan] and ConocoPhillips. No Marketer Supplied Dealer or any other third party is a third party beneficiary under this Agreement."

21

To ensure compliance with the "Brand and Image Standards," section 5 requires that Handi-Stop participate, at Gulshan's expense, in the ConocoPhillips "Brand and Image Standards Program." Section 5 provides that evaluations of Handi-Stop's compliance with the Brand and Image Standards "*shall be communicated through an evaluation form completed by ConocoPhillips* or its designee." (Emphasis added.) Section 5 provides that, in the event that Handi-Stop failed an evaluation, *ConocoPhillips was to give written notice to Gulshan*. Then, Gulshan was required to contact the gas station and ensure that the deficiency was corrected. The remedy for any failure to uphold the Brand and Image Standards was for ConocoPhillips to assess fees against Gulshan, to "debrand" Handi-Stop of its Phillips 66 affiliation, or to terminate the BMA.

Thus, the BMA assigns the duty to inspect Handi-Stop for compliance with the Brand and Image Standards to ConocoPhillips, not to Gulshan. Importantly, Bauer expressly states in her appellate brief that "Gulshan was not obligated to inspect stores under the BMA."

Bauer further asserted that Gulshan assumed a duty to Emily, arising in tort, to exercise reasonable care in inspecting and monitoring Handi-Stop because Gulshan agreed to maintain "extensive control" over the store. *See Golden Spread Council, Inc.*, 926 S.W.2d at 289–90.

22

It is undisputed, however, that Gulshan did not own or operate Handi-Stop. Rather, as Bauer states in her brief, "[a]t the time of Emily's injury, Bin was the owner and dealer of the [Handi-Stop]." And, the undisputed summary-judgment evidence shows that, at such time, Handi-Stop was leased to and operated by Khan.

Importantly, under the terms of the Marketing Contract between Gulshan and Bin, the parties expressly agreed that Gulshan would have no right of control over Bin's operation of Handi-Stop:

> Nothing in this Agreement is intended to make [Bin] and [Gulshan] joint venturers or partners, or otherwise to create a master-servant or principal-agent relationship between [Bin] and [Gulshan]. Neither party shall have the authority to make any commitments whatsoever in the name or on the behalf of the other. . . .
>
> In the performance of this Agreement, Dealer [sic] acknowledges that *[Bin] is engaged as an independent business entity and is familiar with the operation and management of the convenience store and service station business, and nothing herein shall be construed as granting [Gulshan] any right to control or direct [Bin] with respect to [Bin's] conduct of such business(es). . . .*

(Emphasis added.) We further note that Bauer expressly states in her brief that her claim is "not based on theories of agency."

We conclude that Bauer did not present evidence to raise a genuine issue of material fact regarding the duty element of her negligence claim, based on a simple negligence theory. *See Ridgway*, 135 S.W.3d at 600; *Havner*, 953 S.W.2d at 711.

23

## 2. *Negligent Undertaking*

Bauer asserted, in her summary-judgment response, that Gulshan "undertook duties" to "inspect and monitor the activities" at Handi-Stop. And, "Gulshan was responsible for 'taking action to correct or improve any deficiencies' identified during an evaluation." In doing so, Gulshan entered into a contractual agreement to render services at Handi-Stop. Thus, she asserts, Gulshan had a common-law duty to Emily to exercise reasonable care in undertaking its contractual obligations.

With respect to the duty element of her negligent-undertaking claim, Bauer was first required to present evidence that Gulshan "*undertook to perform* services that it knew or should have known were necessary for [Emily's] protection." *See Nall*, 404 S.W.3d at 555–56 (emphasis added).

In *Fort Bend County Drainage District*, the supreme court held that a "mere promise to render a service *coupled with neither performance nor reliance* imposes no tort obligation upon the promisor." 818 S.W.2d at 396 (emphasis added). There, the District promised a landowner that it would repair any damage caused by the District's use of a bridge on the owner's land. *Id.* at 393–94. Later, a second party, an easement holder, notified the District that the bridge had become unsafe. *Id.* at 394. The District promised the easement holder that it would repair the bridge. *Id.* After months passed without repairs, a third party (member of the public) crossed the bridge in a truck, the bridge collapsed, and the truck fell into the drainage

24

channel. *Id*. The driver sued the District, arguing that the District, having promised repairs (to the easement holder), had undertaken a duty to repair the bridge. *Id.* at 395. The supreme court disagreed, concluding that the District's promises alone did not constitute an undertaking of an affirmative *course of action* and that there was no evidence that the District had taken any affirmative action thereafter. *Id*. at 396–97. Further, because the District's promises were not communicated to the injured plaintiff, he could not have relied upon them. *Id*. at 397. And, even though the District had repaired other area bridges in the past, such conduct did not give rise to a duty to act on the occasion at hand. *Id.* The supreme court held that, "[w]ithout some affirmative course of *action* beyond the making of a mere promise or without reliance on that promise," the District did not have a duty *to the driver* with respect to repairs. *Id.* (emphasis added) (applying Restatement (Second) of Torts, § 324A).

Similarly, this Court, in *Knife River Corporation v. Hinojosa,* held that the plaintiff presented no evidence to support her negligent-undertaking claim. 438 S.W.3d 625, 637 (Tex. App.—Houston [1st Dist.] 2014, pet. denied.). There, the Texas Department of Transportation ("Department") contracted with a contractor to resurface a section of highway. *Id*. at 628. The contract incorporated the Department's standards and required the contractor to give the Department written notice of any latent conditions. *Id*. at 628–29. During the project, the contractor noted a safety condition in a section of road involving a culvert and a steep drop-off

25

but did not send notice. *Id*. at 629. Once the project was complete, a Department engineer inspected the work, but the safety issue remained. *Id*. Subsequently, a motorist was killed when his truck hit the culvert. *Id*. at 627–29. The driver's spouse sued the contractor for negligent-undertaking, asserting that the contractor had undertaken certain duties under the construction contract for the benefit of third parties, such as the driver. *Id*. at 629 ("On entering a contract which it should have recognized as necessary to the protection of the public, Knife River [] had a duty to exercise reasonable care in the performance of that contract."). Specifically, she alleged, the contractor undertook duties to remedy such road conditions and to make the roadway safe. *Id*. at 630, 634. This Court, in reviewing the contract, noted that rectifying the road condition was outside the scope of work and that there was no affirmative undertaking. *Id*. at 630, 637. We held that, because the law imposes a duty to perform without negligence only those tasks that the actor has *undertaken to accomplish*, the defendant owed no duty to the driver as a matter of law. *Id*. at 637 (applying Restatement (Second) of Torts, § 324A).

Here, in her summary-judgment response, Bauer asserts that Gulshan, who is a gasoline supplier, undertook duties to "prevent the sale of drugs and drug paraphernalia at Handi-Stop[] *which Gulshan did not do*." (Emphasis added.) And, she stated, "Gulshan admits 'no inspections were conducted as to inside sales inside

26

the retail store from the applicable time period of January 31, 2012 to December 31, 2012.'"[14]

Thus, Bauer seeks to impose a duty on Gulshan for *failing* to act, not for the manner in which it affirmatively acted. Again, "[t]he critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant ***acted*** in a way that requires the imposition of a duty where one otherwise would not exist." *Nall*, 404 S.W.3d at 555 (emphasis added).

Bauer's evidence includes eight Brand and Image Inspection reports conducted by a representative of Market Force Information, Inc., on behalf of ConocoPhillips/Phillips 66. These include inspections of the Handi-Stop convenience store in February, April, August, and October 2012 (Emily's injury occurred in December 2012). Thus, in accordance with section 5 of the BMA, ConocoPhillips was in fact inspecting Handi-Stop for compliance with the Brand and Image Standards. And, Bauer speculated in her summary-judgment response

---

[14] In her motion for rehearing, Bauer asserts that the majority erred in stating that she had argued that Gulshan did not perform inspections inside the retail store after January 31, 2012. However, the record shows that she asserted in her live petition that "Gulshan did not do inspections inside the retail store after January 31, 2012." In her summary-judgment response, she argued: "Gulshan admits 'no inspections were conducted as to inside sales inside the retail store from the applicable time period of January 31, 2012 to December 31, 2012.'" And, in her brief on appeal, she stated: "On July 22, 2016 Gulshan admitted that it failed to conduct inspections of the interior of the Huffmeister store. (14CR3634, 3635, 3639, 3641) ("no inspections [by Gulshan] were conducted as to inside sales inside the [Huffmeister store] from the applicable time period of January 31, 2012 to December 31, 2012.").

that "[t]hrough Phillips 66 [ConocoPhillips] inspection reports" it was "more likely than not that Gulshan learned [that] pipes were being sold at the counter." Bauer asserted that "Gulshan was responsible for 'taking action to correct or improve any deficiencies' identified during an evaluation." However, no such material is mentioned in any of the ConocoPhillips inspection reports. More importantly, however, this evidence goes to what Gulshan knew or should have known, and not to whether it undertook to perform services. *See Nall*, 404 S.W.3d at 555–56 (providing, in pertinent part, that, to establish "negligent undertaking," plaintiff must first show that "the defendant *undertook to perform services* that it knew or should have known were necessary for the [third person's] protection") (citing RESTATEMENT (SECOND) OF TORTS § 324A ("*One who undertakes*, gratuitously or for consideration, to render services to another. . . .")); *Fort Bend Cty. Drainage Dist.*, 818 S.W.2d at 397; *Knife River*, 438 S.W.3d at 637.

Bauer also points to a photograph of trash outside the Handi-Stop store and a photograph attached to an inspection report dated March 21, 2014, some 15 months *after* Emily's injury. Bauer also points to deposition testimony and statements that synthetic marihuana was in fact purchased at Handi-Stop in the months leading up to, and on the day of, Emily's injury. Again, this evidence goes to what Gulshan knew or should have known, and not to whether it affirmatively undertook to

28

perform services. *See Nall*, 404 S.W.3d at 555–56; *Fort Bend Cty. Drainage Dist.*, 818 S.W.2d at 397; *Knife River*, 438 S.W.3d at 637.

Bauer further asserted that Dhanani's deposition testimony reflects that Gulshan undertook to inspect and "safeguard" the Handi-Stop. The record shows that Dhanani testified that Zafar Tahir inspected stores that Gulshan and its subsidiary "operated," not stores that were leased out. Dhanani testified that, hypothetically, if he were to become aware that any of Gulshan's stores were selling synthetic marihuana, he would have "immediately stopped it." It is undisputed that Gulshan did not own or operate Handi-Stop. Rather, Bin owned the Handi-Stop and leased it to Khan. Dhanani testified that Gulshan generally did inspect stores for which it was "just a supplier of fuel," and he discussed how he "assum[ed]" such inspection might work in "a hypothetical case." With respect to whether Gulshan ever inspected Handi-Stop, however, Dhanani testified:

> Q. Do you know specifically if Gulshan ever inspected [Handi-Stop]?
> A. Specifically, I don't know.

Like in *Fort Bend County Drainage District*, evidence that Gulshan had performed other inspections of other stores in the past does not constitute evidence of an affirmative undertaking at Handi-Stop. 818 S.W.2d at 397 (holding evidence that District had repaired other area bridges in past did not alone give rise to duty to repair on occasion at issue). The summary-judgment record further shows that

29

Hameed testified that ConocoPhillips performed inspections of the store and sent the reports to Gulshan and to him. Hameed then met with the tenant, Khan, as necessary.

In support of her argument, Bauer relies on *EnGlobal U.S., Inc. v. Gatlin*, 449 S.W.3d 269 (Tex. App.—Beaumont 2014, no pet.). There, Phillips 66 contracted with Clean Harbors, an industrial service contractor, to clean oil storage tanks at a refinery. *Id.* at 272. Gatlin, an employee of Clean Harbors, was injured while working at the refinery. *Id.* At the time of the accident, ENGlobal was a contractor performing engineering and construction management services for Phillips 66 at the refinery. *Id.* at 272–73. The relationship between ENGlobal and Phillips 66 was governed by a master service agreement ("MSA"). *Id.* at 273. Gatlin sued ENGlobal for negligence, asserting a negligent-undertaking theory. *Id.* The court concluded that, to the extent that the MSA required ENGlobal to provide "safety over the work site," then ENGlobal had a contractual duty under the MSA to make the work site safe in the manner, if any, specified by the MSA. *Id.* at 282. And, to the extent ENGlobal undertook to perform its contractual promise to provide safety, and to the extent it should have recognized that its actions were necessary for the protection of Gatlin, then ENGlobal also had a duty in tort to exercise reasonable care in performing its undertaking so as not to injure Gatlin. *Id.* Here, unlike in *ENGlobal*, there is no evidence that Gulshan had a duty under the BMA to inspect Handi-Stop or that Gulshan affirmatively performed any services.

30

Bauer and the dissenting opinion rely on *Seay v. Travelers Indemnity Co.*, 730 S.W.2d 774, 777–78 (Tex. App.—Dallas 1987, no writ). There, a hospital maintenance employee died from injuries he suffered when a safety-relief valve on a boiler discharged scalding water onto him. *Id*. at 775. The plaintiff-spouse sued the hospital's insurer, asserting that it was negligent in inspecting the boilers. *Id*. It was undisputed that, for several years, employees of the insurer had conducted statutorily-required inspections of the boilers and had reported favorably. *Id*. The court stated that, when "performing inspections," the insurer "was performing acts which directly promoted the interests of [the hospital] in the safety of its boilers and thereby was undertaking to render services to [the hospital]." *Id*. at 779. Thus, in performing its inspections, the insurer had a duty to the hospital's employee to perform them properly. *See id*. at 780. Here, unlike in *Seay*, Bauer presented no evidence that Gulshan affirmatively performed inspections of the Handi-Stop convenience store.

Bauer's and the dissenting opinion's reliance on *Fox v. Dallas Hotel Co.*, 240 S.W. 517, 520–21 (Tex. 1922), *overruled on other grounds*, *Burk Royalty v. Walls*, 616 S.W.2d 911 (Tex. 1981), is also misplaced. In *Fox*, a night-watchman died from injuries he sustained when an elevator fell. *Id.* at 517. There, "the uncontradicted evidence established that the defendant in error had, prior to the injuries received by [the decedent], to subserve its own interests, placed engineers in active and actual

31

charge and control of the elevators" at issue. *Id.* at 518. The court held that the defendant, by "taking over the control and repair of the elevators, to promote its own interests, it became charged with the duty . . . to exercise ordinary care to maintain the elevators in a condition of reasonable safety for use." *Id.* at 520. No such evidence is presented in the instant case.

Having viewed all the evidence in the light most favorable to Bauer, we conclude that she did not present more than a scintilla of probative evidence to raise a genuine issue of material fact regarding the duty element of her negligence claim against Gulshan. *See Ridgway*, 135 S.W.3d at 600; *Havner*, 953 S.W.2d at 711. Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Gulshan on Bauer's negligence claim. *See* TEX. R. CIV. P. 166a(i); *KPMG Peat Marwick*, 988 S.W.2d at 748.

Because Bauer did not establish the breach of a legal duty, we do not reach her assertions that the summary-judgment evidence established the existence of genuine issues of material fact regarding proximate cause. *See Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998) ("The nonexistence of a duty ends the inquiry into whether negligence liability may be imposed.").

We overrule Bauer's sole issue.

## Conclusion

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Keyes and Countiss.

Keyes, J., dissenting.